HARP *v.* ADAMS *et al.*

1. In all civil cases the preponderance of testimony is considered sufficient to produce mental conviction. (Civil Code (1910), § 5730.) It is therefore not error, on an issue formed by a caveat to an application

to probate a nuncupative will, to instruct the jury that the burden is upon the propounders to prove the material allegations of their petition by a preponderance of the evidence.

2. It was not error to charge: "In testing the validity of an alleged nuncupative will, it is impossible to lay down a fixed and unvarying rule as to what length of time may elapse between the dictation of said will and the death of the testatrix. The test to be applied is not one of time alone. The length of time must be considered in connection with and in the light of all the circumstances surrounding the occasion. After all, it is a question of fact to be determined by the jury, whether or not under all the circumstances there was a reasonable opportunity to make a written will. A nuncupative will must be made in the last sickness, and is allowed under the law from necessity, and must be in extremis; and if you believe that Mrs. Harp, after making the alleged nuncupative will, had the time and opportunity, and means at hand, to have reduced it to writing, but failed to do so, then said alleged will is invalid."

3. The statute requires that a nuncupative will must be proved by the oaths of at least three competent witnesses who were present at the making thereof, and that the substance of the testamentary disposition must be reduced to writing within thirty days after the speaking of the same. On the hearing of the application for probate there must be a substantial concordance of the testimony of the witnesses by whom the will is sought to be proved with the spoken words of the decedent as reduced to writing; and failing in this regard, the will is invalid and should not be probated.

JUNE 15, 1914.

Probate of nuncupative will. Before Judge Gilbert. Chattahoochee superior court. July 22, 1913.

*T. T. Miller* and *Wynn & Wohlwender,* for plaintiff in error.
*Hatcher & Hatcher,* contra.

EVANS, P. J. A petition was filed in the court of ordinary of Chattahoochee county by Mrs. Dirilda Adams, Miss Narcissa Hewell, H. T. Hewell, W. L. Hewell, and Robert Hewell, sisters and brothers of Mrs. Theressa Harp, deceased, asking for the probate of a nuncupative will alleged to have been made by her. A. D. Harp, the husband and sole heir at law of the deceased, filed a caveat to the probate of the alleged will. By consent the case was appealed to the superior court, where a verdict was rendered in favor of the propounders. The caveator moved for a new trial, which was refused, and he excepted.

There was testimony tending to show that Mrs. Theressa Harp was taken ill at her residence. Upon the sixth day of her illness a physician from the city of Columbus was called in consultation with the physician who was treating her. As a result of the consultation the patient was found to be afflicted with appendicitis,

and her condition was so grave that her doctors deemed it advisable that she should be carried to the hospital at Columbus, Georgia, for an immediate surgical operation. When the patient was informed of the gravity of her condition and the advice of her physicians, hasty preparations were made to take her to Columbus. While these preparations were in progress the patient stated to the bystanders that she might not recover of her illness, and desired to make a will, and made a disposition of her property. Within an hour after her attention was called to the necessity of an operation, and after she made a parol declaration as to the disposition of her property upon death, she was carried by automobile to Columbus, where she underwent an operation shortly after her arrival at the hospital. After the operation was performed she did not regain consciousness, and died on the following morning. Within thirty days after speaking the alleged nuncupative will three of the bystanders went before a magistrate and reduced to writing the substance of the alleged testamentary disposition, as follows: "I want all my property equally divided between my brothers and sisters and Mr. A. D. Harp. And if Lovie and Sandy would go and live with Narcissa and Bobbie, at their death the land would go to them. My property consists of one half of the John Hewell land, and my interest in my father's estate. I have six hundred and five dollars in the bank." This writing was subscribed by William C. Hewell, Mrs. Rena B. Sapp, and Mrs. Lula Jackson. On the trial Mrs. Sapp testified that the deceased said she wanted her property equally divided among her brothers and sisters and Mr. Harp, an equal division among them all; and if Mr. and Mrs. Sandy Cooksey would go down to Mr. Hewell's, her brother, to live with Bob Hewell and Miss Narcissa Hewell, at her death she wanted them to have her part of the property she left Mr. Bob and Miss Narcissa—wanted it to go to this niece and nephew if they would go down there and live; and if they did not, she wanted it to go back to the estate. W. C. Hewell testified that she said "she wanted her property divided between her brothers and sisters and her husband, A. D. Harp, equally. My recollection is, that, after she had made this first part of her will as to the property being divided, she said if Sandy and his folks would go down to the old homestead. I don't know whether she said old homestead or not, but that's where the land was. She said at their death the land that was to go to them

would go to Sandy and his folks. They were to go down there to stay with those cousins, her sister and brother Robert. The way I understood it was, that if they would go and live with them, at their death their part would go to them. Everybody knew who Lovey and Sandy was, and she said if they would go and live with Narcissa and Bob, that in that event the property would go to them. She said probably she would will it to them. My understanding was that the property was to go to them, just like I would tell you such and such a thing would go to you." Mrs. Lula Jackson testified: "Mrs. Harp said, 'I am going away to Columbus. Dr. Cook is going to take me away for an operation. I don't know whether I will ever come back alive or not, and I want to make my will;' and Mr. Harp called to the doctors to know if she was in her right mind, and they answered yes; and she went on to say that she had but very little property, but what little she had she wanted equally divided among her brothers and sisters and Mr. Harp, and Dr. Hewell called on her to know of what her property consisted, and she told them her property was the old John Hewell place and her part of the old Hewell property, and six hundred and five ($605) dollars in the bank. The name of Lovey and Sandy was mentioned, and she said if they would go and live with Narcissa that probably Narcissa would will them her property at her death." On cross-examination the witness testified that Mrs. Theressa Harp said that she "wanted her property equally divided among her brothers and sisters and Mr. Harp, and that she had her part of the John Hewell property and her part of the Joe Hewell property and six hundred and five ($605) dollars in the bank, and that she wanted Lovey and Sandy to go and live with Narcissa, and probably at her death she would give the property to them. I guess Mrs. Harp said the land would go to Narcissa and Bob. I said 'probably' a while ago because that just came to my mind, I reckon. The caveator introduced testimony tending to show that no will was made; and also as to the mental and physical condition of the deceased at the time she was alleged to have made a parol disposition of her property.

1. Several grounds of the motion complain of the court's instruction to the jury, that on an issue formed by a caveat to an application to probate a nuncupative will the burden was upon the propounders to prove the material allegations of the petition by a preponderance of the evidence. The contention of the caveator is

that, inasmuch as nuncupative wills are not favored in law, they must be strictly proved before they should be admitted to probate, and that it was error to instruct the jury that they would be authorized to probate such a will if the same is established by a preponderance of the testimony. The statute declares that in all civil cases the preponderance of testimony is sufficient to produce mental conviction. Civil Code (1910), § 5730. This rule as to the sufficiency of evidence is applicable in all civil cases, and the court did not err in applying it to the case at bar.

2. Exception is taken to the following excerpts from the court's charge: "In testing the validity of an alleged nuncupative will, it is impossible to lay down a fixed and unvarying rule as to what length of time may elapse between the dictation of said will and the death of the testatrix. The test to be applied is not one of time alone. The length of time must be considered in connection with and in the light of all the circumstances surrounding the occasion. After all, it is a question of fact to be determined by the jury, whether or not under all the circumstances there was a reasonable opportunity to make a written will. A nuncupative will must be made in the last sickness, and is allowed under the law from necessity, and must be in extremis; and if you believe that Mrs. Harp, after making the alleged nuncupative will, had the time and opportunity, and means at hand, to have reduced it to writing, but failed to do so, then said alleged will is invalid." The exception to these excerpts is that the court limited the jury to the consideration only of the time which elapsed after making the alleged nuncupative will, whereas he should have instructed the jury that if the deceased, either before or after making the alleged nuncupative will, and during her last illness, had the time and opportunity to make a written will, and failed to do so, the alleged nuncupative will would be invalid. The statute provides for the making of a nuncupative will in the time of the last sickness of the deceased. The statute does not contemplate, if a person has been sick for a long space of time, that, upon the illness reaching a critical turn, such person could not then be permitted to make a nuncupative will, because perchance before that time, if her attention had been called to the making of a will, she would have had the means and opportunity of reducing her testamentary disposition to writing. Where a sickness has progressed to a point where the testator expects death at

any time, and, as preparatory thereto, makes an oral will, and the circumstances are such that it can not be reduced to writing, and death results from such illness, a nuncupative will will be admitted to probate, if the statute in other respects is complied with. The excerpts to which exception was taken were, in the main, taken from the opinion of this court in *Bellamy* v. *Peeler, 96 Ga.* 467 (23 S. E. 387), and were not open to the criticisms made against them. See *Scaife* v. *Emmons, 84 Ga.* 619 (10 S. E. 1097, 20 Am. St. R. 383). The testimony was such as to authorize the jury to find that Mrs. Harp in the time of her last sickness, at her home, within about sixteen hours before her death, and in contemplation of the fatal results of a contemplated operation, called upon persons present, or some of them, to bear witness that she was making her last will.

3.    The statute requires that a nuncupative will must be proved by the oaths of at least three competent witnesses who were present at the making thereof; that the substance of the testamentary disposition must be reduced to writing within thirty days after the speaking of the same; and application for its probate must be made within six months after the death of the testator. Civil Code (1910), §§ 3925, 3926. The testimony of the witnesses relied upon to prove the will must agree at least substantially as to the words spoken, or the disposition made by the testator. There can be no disposition of the property if the witnesses can not concur as to what in substance was such disposition. There is a material difference between the alleged disposition as reduced to writing and the testimony of the witnesses relied upon to establish the nuncupative will. In the will, as reduced to writing, the share of the decedent's estate purporting to have been devised to her brother and sister, Bobbie and Narcissa, was to be limited to a life-estate, provided that "Lovey" and "Sandy" (Mr. and Mrs. Sandy Cooksey) would go and live with them. In her testimony Mrs. Sapp said that the decedent stated that if this niece and nephew did not comply with the condition named in the will, then she wanted the part devised to that brother and sister to go back to the estate. Again, Mrs. Jackson testified that the decedent did not make any limitation over to her nephew and niece, Mr. and Mrs. Cooksey, but that she merely said, if they would go and live with her brother and sister (Bobbie and Narcissa), that probably the sister, Narcissa, would give them her property at her death. These are substantial

differences as to the testamentary disposition of the decedent. It was the intention of the statute that a nuncupative will should be proved by three witnesses; and where there is a variance among them, in substance, as to bequests and disposition, there is a failure to meet the requirements of the statute; and if the parol disposition reduced to writing and offered for probate is not substantially the same as the words spoken, the will is invalid. Bolles *v.* Harris, 34 Ohio St. 38; Mitchell *v.* Vickers, 20 Tex. 377. Because of the variance between the witnesses who were called to prove the will, as to the bequests and disposition of the decedent, the verdict is not supported by the evidence, and a new trial must be had.

*Judgment reversed. All the Justices concur.*